NOT DESIGNATED FOR PUBLICATION

No. 119,355

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of R.G.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Finney District Court; RICHARD H. HODSON, judge. Opinion filed November 2, 2018. Affirmed.

*Eric Fournier*, of Calihan Law Firm, P.A., for Garden City, for appellant natural mother.

*Kristi Cott*, assistant county attorney, and *Susan Lynn Hillier Richmeier*, county attorney, for appellee.

*William A. Wright*, of Garden City, guardian ad litem.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM: The natural mother of R.G., born 2017, appeals from the district court's determination that R.G. was a child in need of care (CINC). She argues that the State failed to show sufficient evidence to meet the clear and convincing evidence standard. But the district court found that R.G. was a CINC for several reasons, including the following: Mother refused to permit the hospital to airlift R.G. for life-saving surgery for 30 minutes; R.G. was diagnosed with a life threatening stomach condition that was untreated; this condition was obvious to laypeople; Mother missed crucial medical appointments for R.G.; and R.G. was dehydrated, losing weight, and had dangerously low

1

sodium levels. We find sufficient evidence to support the district court's determination that clear and convincing evidence shows R.G. to be a CINC, so we affirm.

*Factual and Procedural Background*

In an adjudication hearing, the district court found R.G., a minor child, is a CINC under K.S.A. 2017 Supp. 38-2202(d). Mother contends solely that the district court lacked sufficient evidence for the CINC finding.

Several witnesses testified for the State. Dr. Jeremy Roderick stated that after Mother gave birth to R.G., he scheduled a follow-up appointment to check on R.G.'s health. This check-up is customary and usually occurs four to seven days after birth. Mother missed this appointment.

Roderick saw R.G. three weeks after the delivery, at which time R.G. was spitting up excessively and not gaining weight. Roderick could not conclusively determine the cause and prescribed Zantac for potential reflux and ordered a weight check one week later.

One week later, R.G.'s aunt and great-grandmother brought R.G. to the appointment without Mother. Roderick determined that R.G. had lost more weight, weighed less than his birth weight, and looked sick. Roderick agreed that this weight loss was obvious enough for a layman or Mother to notice. R.G. was admitted to the intensive care unit at St. Catherine's Hospital. Only several hours later did Mother arrive at the hospital. Roderick had been led to believe by Mother's father that Mother arrived late because of a flat tire. But later testimony established that Mother missed the appointment because she had been arrested earlier that morning and had not been released until the afternoon.

Roderick, along with pediatrician Dr. Jim Zauche, requested that R.G. be moved to Wesley Medical Center for further testing and surgery. The doctors suspected that R.G. had pyloric stenosis—a potentially fatal intestinal blockage—as well as other medical issues that could not be treated at St. Catherine's. Roderick could not conclusively determine what caused the pyloric stenosis, but several factors can contribute, such as drug use while pregnant, a change in baby formula, acid reflux, or mere "unfortunate happenstance." He testified that without surgical treatment for the pyloric stenosis, R.G. would have likely died from malnutrition. In addition to the pyloric stenosis diagnosis, Roderick determined that R.G. was low on sodium, consistent with continued vomiting.

At first, Mother refused to permit R.G. to be transported. After around 30 minutes, the doctors threatened to contact the authorities and Mother agreed to permit R.G. to be airlifted to Wichita. During this conversation with Roderick, Mother "seemed out of it." Roderick said it was possible this behavior was attributable to drug or alcohol use.

Dr. Richa Lakhotia, who saw R.G. at the Wesley Medical Center Intensive Care Unit, then testified. Lakhotia elaborated on much of Roderick's testimony. He stated that after R.G. was transported to Wesley Medical Center, R.G. was tested and had a sodium count of 114. Sodium levels that low can cause seizures or death. Lakhotia treated R.G. with IV fluids to bring his sodium count up to an acceptable range—between 135-145. Without medical treatment, these sodium levels would not have corrected. Lakhotia also confirmed the diagnosis of pyloric stenosis. R.G. received surgery and the abnormality was corrected.

While R.G. received treatment, Carol Khan, a social worker at Wesley Medical Center, met with Mother. She did so because of concerns about lack of care for R.G. before he arrived at Wesley. But during the interview, Mother refused to share information with Khan. Mother then provided conflicting answers about R.G.'s health

3

insurance. Khan was very concerned after her first meeting with Mother because of the lack of information, the inconsistent information, and Mother's unwillingness to talk.

The State's final witness was a Department for Children and Families (DCF) social worker, Kimberly Klein. After receiving reports of potential abuse, Klein met with Mother while R.G. was in the hospital. Klein also reported that Mother was uncooperative and would not answer questions. Klein suggested that Mother take a drug test to show good faith because Mother had a history of complaints with DCF. Mother declined.

Klein also testified that Mother had tested positive "two or three times" for methamphetamine while pregnant with R.G. and had stopped a treatment program. To explain the significance of these test results, Klein elaborated on Mother's history. She stated that Mother's history raised red flags for R.G.'s wellbeing. Behaviors such as a "significant history of drug use," prior DCF involvement, an unwillingness to participate with DCF, refusal to drug test, and Mother's recent initial refusal to allow R.G. to be airlifted concerned her. Klein also explained that the State had terminated Mother's parental rights to her three other children.

Mother's first witness was her friend, Heather Wilshusen. Wilshusen clarified that on the day of R.G.'s weight check-up, Mother had gone to the police station in Scott City "to pay a bill or something." But when Wilshusen and Mother arrived, Mother was arrested. Mother requested Wilshusen take R.G. to Mother's sister, Yvonne, so that R.G. could make his appointment later that day.

While Wilshusen had R.G., she noticed he was spitting up, but she stated that R.G. was not in such a poor condition or "to the extreme" that other witnesses testified to.

Next, Mother's sister, Yvonne Garcia, testified. Yvonne explained that she and her grandmother brought R.G. to his doctor's appointment after Mother was arrested. When asked how R.G. looked that day, Yvonne stated that "[h]e was doing better than most days." On cross-examination, Yvonne explained that she worried daily for R.G's health. She "knew he wasn't supposed to be throwing up as much as he did" and that something seemed wrong. Yvonne also stated, however, that Mother was concerned about R.G.'s health and had purchased various remedies for infant stomach issues. She said that Mother had taken R.G. to the hospital several days before R.G's check-up with Roderick.

Mother also testified. She stated that she had taken R.G. to the emergency room before R.G.'s check-up with Roderick. The emergency room physician had given her formula for R.G. Mother explained that on the day of R.G.'s appointment she had driven to the police station "to take care of a bench warrant" because she had missed a court date for a ticket for animal cruelty. When she was arrested on that warrant she handed R.G. to Wilshusen. After she was bonded out, she went to see R.G. at St. Catherine's Hospital.

Mother stated that she was very stressed and concerned for R.G., and that her initial reluctance to permit him to be transferred by helicopter resulted from that stress and a desire to be with her son. While at the hospital, Mother did not want to answer the medical center's social worker's questions because they pertained to her other children. Likewise, Mother was uncooperative with DCF because she believed that they would take R.G.

After considering the evidence, the district court found that R.G. was a child in need of care. While the court found that no link was proven between Mother's alleged drug usage and R.G.'s medical condition, other factors weighed in favor of the CINC finding. The court listed R.G.'s critical status and ICU referral, the easily identified but untreated pyloric stenosis, low sodium count, weight loss, and malnutrition as considerations in making the CINC finding. The court found that it understood "a parent

5

with a critically ill newborn wanting to be with the child," but this was not sufficient to delay R.G.'s transportation and ultimately, his life-saving surgery. The court added that missed appointments, coupled with the fact that R.G.'s sickness was readily apparent but untreated, weighed in favor of finding R.G. to be a CINC.

Mother timely appeals.

*Does Sufficient Evidence Show That R.G. Was a Child in Need of Care?*

Mother's sole contention on appeal is that the district court lacked sufficient evidence to find that R.G. is a CINC. Mother states that the entire basis of the district court's decision was the 30-minute period when Mother refused to permit R.G. to be airlifted to a different medical facility. This single factor, according to Mother "is wholly insufficient to convince a rational factfinder" that R.G. was a CINC. Mother states that the delay resulted only because she wanted to be with her son, and upon "realizing that was not going to happen, she permitted [R.G.] to be transported to Wichita." Further, Mother notes that all other evidence provided at trial was "uncontroverted" and proved that she acted in a prudent manner with regard to R.G.'s well-being.

K.S.A 2017 Supp. 38-2202(d) defines a child in need of care:

"(d) 'Child in need of care' means a person less than 18 years of age at the time of the filing of the petition or issuance of an ex parte protective custody order . . . who:
(1) Is without adequate parental care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian;
(2) is without the care or control necessary for the child's physical, mental or emotional health; [or]
(3) has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 2017 Supp. 38-2202(d)(1-3).

6

An appellate court reviewing a trial court CINC determination "should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the child was a CINC." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). Clear and convincing evidence "is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. In reviewing the lower court's findings, an appellate court should not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). We note that a broad range of testimonial evidence" may lead "a rational factfinder" to find "it highly probable that [the child] was a child in need of care." *In re J.B.*, No. 107,256, 2012 WL 4795633, at *6 (Kan. App. 2012) (unpublished opinion).

Here, viewing the evidence in the light most favorable to the State, we find sufficient evidence to conclude that a rational fact-finder could have found it highly probable that R.G. was a CINC. The record refutes Mother's assertion that the trial court based its decision solely upon the 30-minute period when Mother refused to permit R.G.'s transportation. The 30-minute delay was an important factor, of course, as that delay postponed necessary and life-saving surgery.

But the district court specifically listed several additional factors which led to its CINC determination, including:  (1) R.G. was one month old, was brought to the intensive care unit in critical condition, and had to be airlifted to Wichita; (2) R.G. was diagnosed with pyloric stenosis; (3) R.G. had seriously low sodium levels; (4) R.G. was dehydrated and needed IV fluids; (5) R.G. weighed less than his birth weight and was malnourished; (6) Mother missed check-ups for R.G.; and (7) R.G.'s poor health was readily apparent to laypeople.

Viewing the record in the light most favorable to the State, we find sufficient evidence to show a high probability that R.G. was "without adequate parental care," and that he did not receive the care necessary for his physical and mental health. See K.S.A 2017 Supp. 38-2202(d); *In re B.D.-Y.*, 286 Kan. at 707 (upholding the trial court's finding that a child was a CINC after the child was admitted to the hospital with multiple bruises and at least 12 rib fractures, and had been left "without the care or control necessary for [the child's] physical health"; *In re R.B.S.*, 29 Kan. App. 2d 1023, 1029, 36 P.3d 300 (2001) (upholding the trial court's finding that a child was a CINC where the record showed that the child was without proper prenatal care necessary for the child's physical, mental, or emotional health). No more is necessary.

Because we are convinced that a rational fact-finder could have found it highly probable that R.G. was a child in need of care, we affirm.